[Crim. Nos. 7610, 7615, 7616, 7617. In Bank. June 17, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. FRED M. CLARK, LEROY COULVERSON, JR., and LIONEL DAVIS, Defendants and Appellants.

Thomas W. LeSage and James B. Cooney, under appointment by the Supreme Court, Erling J. Hovden, Public Defender, James L. McCormick and Paul G. Breckenridge, Jr., Deputy Public Defenders, for Defendants and Appellants.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

PETERS, J.—A jury found defendants guilty of the first degree murder of Roberto Jordan, and of the first degree robbery of Robert Crosley. Coulverson and Davis submitted the question of penalty to the court, and were sentenced to life imprisonment.[1] The penalty issue as to Clark was tried before the jury which determined that he should suffer death. Motions for new trial on behalf of all defendants were made

[1]Davis had also been charged with, and admitted, a prior conviction of burglary in 1960. He had been granted probation on that prior charge, and the probation was still in effect when he was taken into custody in the instant matter. When sentencing Davis in the present case, the court revoked the existing probation and sentenced him to a concurrent term in the state prison. Davis filed a separate notice of appeal from that order and conviction, thus giving rise to appeal Crim. 7617, discussed below.

and denied. Clark made a motion to reduce the penalty, which was also denied.

Clark's appeal from the judgment imposing the death penalty (Crim. 7610) is automatic (Pen. Code, § 1239, subd. (b)). With it have been joined the appeals which Coulverson and Davis took from their convictions (Crim. 7615 and 7616), as well as the appeal taken by Davis from the judgment in regard to the prior offense mentioned in footnote 1 (Crim. 7617).

■ Appeal Crim. 7617 may be disposed of summarily. Although Davis presents no arguments in reference to this appeal, it appears that the sentence was imposed to run concurrently with that imposed in Crim. 7616. Inasmuch as the proceedings in Crim. 7616 must be dismissed for reasons hereafter set forth, Crim. 7617 must be remanded for imposition of corrected sentence and rendition of judgment.

*The Facts:*

The prosecution contends that Clark shot and killed Jordan in the course of robbing the Safeway Market at 3887 Crenshaw Boulevard, Los Angeles, on November 29, 1962. According to several witnesses, each of whom positively identified Clark, he entered the market alone, required Crosley (the manager) and several other persons to accompany him, at gun point, to the office safe, where Crosley handed the money over to him. The money was placed in a brown paper bag. Clark then required those present to accompany him to the back door. En route they came upon Jordan, the victim of the murder, who was also a market employee. Clark pointed his pistol at Jordan, ordering him to proceed with the others to the back door. At this moment the pistol was fired, the bullet entering Jordan's head.[2]

It is also undisputed that Coulverson and Davis had ridden with Clark, in Davis' car, to where Clark parked it in an alley behind the market, but Coulverson and Davis did not leave the car during the perpetration of the crime, and were unarmed. Although no witness testified to having seen either of them, each admitted the foregoing facts, both in their extrajudicial statements to the police, and in their testimony

[2] It is Clark's contention that he had no intention of firing the pistol at Jordan, since the latter had not refused to comply with his order, and made no threatening movement. In his extrajudicial statements (introduced by the prosecution) and in his testimony given during the penalty phase, he claimed that the shooting was accidental. He did not testify during the guilt phase.

on their own behalf. They further admitted that when Clark came out of the market he placed the described paper bag on the front seat of the car, got into the driver's seat, and drove the three men to his house. They also admitted that en route he told them that he had killed a man, but each claimed to have disbelieved him.

The prosecution's theory of the case, based primarily upon the various extrajudicial admissions given to the police, was that both Coulverson and Davis knew that Clark intended to perpetrate an armed robbery, and voluntarily accompanied him; that after being advised that Clark had committed murder in the course of the robbery, they accepted a share of the loot; and that they were guilty of both crimes by reason of being accomplices.

The theory presented by both Coulverson and Davis in their testimony during the guilt phase (and in their statements to the police) was that each was an innocent victim of circumstances. That theory was that Clark had loaned Davis the money with which the latter purchased his car; a short time before November 29th Clark told Davis of his plan to commit a robbery and asked him to either join him or lend him the car for that purpose; Davis refused, and Clark became angry (on the ground that his money had purchased the car) and threatened to shoot Davis; knowing Clark to be dangerous, Davis became frightened and suggested that Clark accompany him on the 29th in an effort to sell the car so that Davis could refund the money; after leaving Clark, Davis was apprehended for driving without a license; as a result of the latter circumstance, he asked Coulverson to drive him to Clark's residence; Coulverson, who had worked all night, expected to be driven back to his home, in order to go to bed; Davis expected Clark to accompany him in an attempt to sell the car; although both knew that Clark was armed, and had been talking as if he intended a robbery in the near future, neither had any idea that he planned the same for that day; Clark took over the driving of the car, but did not tell the others where he was going; as Coulverson and Davis were carrying on a conversation regarding possible work for Davis at the club where Coulverson was employed, neither noted where Clark was driving; neither knew where they were when Clark stopped the car in an alley, and against the back wall of a building; at that point Clark asked Coulverson for some change to purchase something, and Coulverson obliged; Clark left them and the two

remained in the car; a short time later Clark returned with the brown paper sack; neither knew what it contained; as stated above, neither believed Clark when he stated that he had killed a man; he said nothing about having committed a robbery at that time; after he had driven the car back to his home, Clark went in, taking the car keys with him; after talking outside for some time, the two entered the house, expecting to get the keys and return to their respective homes; in the house they saw the money on Clark's bed; he admitted the robbery, and tried to give each of them a small part of the loot, but each refused;[3] he told them that he was leaving town immediately, and that they should do likewise; he advised Davis to report his car as stolen;[4] he told them that if either reported the matter to the police, he would return to town and kill them.

Admittedly, there were certain inconsistencies in the testimony on which these two defendants based the foregoing theory.[5] But such inconsistencies, standing alone, were hardly sufficient to sustain a conviction. On the other hand, their extrajudicial statements were of such nature that, if the same were properly admitted, the jury could well have found them to have accompanied Clark with full knowledge and consent. For that reason, it becomes necessary to review the procedures both prior to and during the trial, in order intelligently to assess the issues presented by the claim that the extrajudicial statements should not have been admitted, as well as the other assignments of error. In such review, the chronology is of particular importance.

*November 29, 1962:* The robbery and murder were committed. Only Clark fled the state.

*December 2, 1962:* Davis was arrested, at his home, and taken to the police station. There, according to the testimony

---

[3]The statements and testimony of each indicate that the other may have accepted some portion of the money from Clark. However, the extrajudicial statement of each defendant was, when introduced, limited to that defendant only.

[4]It is not disputed that Davis made no such report, and that neither attempted to hide from the police.

[5]For example, they were unable to explain why Davis should have driven his car to Coulverson's residence in order to have the latter drive him to Clark's house, when he could have as easily driven directly to the latter address. Furthermore, Coulverson's testimony may be interpreted to contain an acknowledgment that the facts stated in his extrajudicial admission were true and correct. On the other hand, it may be interpreted as an acknowledgment that the extrajudicial statement correctly set forth the sequence of events, but not those matters inconsistent with his testimony given in court regarding his lack of knwoledge and consent.

of Officer Fusilier, Davis gave free and voluntary statements.. The nature and manner of taking those statements (as well as the extrajudicial statements of the other defendants) are more fully set forth below.

*December 4, 1962:* Coulverson was arrested at his place of employment and taken to the police station, where he was interviewed and gave a statement. On the same date a complaint was filed in the municipal court charging Clark with murder and robbery, and a warrant was issued for his arrest.

*December 6, 1962:* A complaint was filed in the municipal court charging Coulverson and Davis with murder and robbery.

*January 7, 1963:* Preliminary hearing was held as to Coulverson and Davis, and each was held to answer.

*January 21, 1963:* An information was filed against Coulverson and Davis, and each arraigned: *On the same day, Clark held up a market in St. Louis, Missouri, was shot in the arm, and within a very few days was apprehended by the St. Louis police and taken into custody.*

*January 29, 1963:* Coulverson and Davis were in court to plead. Davis pleaded not guilty, and Coulverson moved for dismissal under Penal Code section 995. That motion was continued until February 7th, and trial set for March 7th.

*February 1, 1963:* Clark gave a statement to the St. Louis authorities, while under arrest. This statement did not name Coulverson and Davis as his accomplices.

*February 26, 1963:* Coulverson, Davis and Clark were jointly indicted by the grand jury for the same offenses with which they were charged in the prior complaints and information. That indictment was predicated, in part, on the testimony of Officer Fusilier given against all three defendants.

*March 1, 1963:* Coulverson and Davis were arraigned on the indictment and pleaded not guilty. Trial was set for March 7th, the same date as had been set for trial under the information.

*March 7, 1963:* Over the objection of Coulverson and Davis, who claimed that they were ready for trial, the prosecution's motion to dismiss the information was granted, and further over the objection of Coulverson and Davis, the prosecution's motion to continue the trial to March 20th, for the purpose of attempting extradition of Clark, was granted.

*March 9, 1963:* Officer Fusilier, in St. Louis for the purpose of Clark's extradition, had an interview with Clark

during which he obtained the latter's signature to a typed copy of the interview given to the St. Louis authorities on February 1st, but only after obtaining several corrections and changes most of which were solely for the purpose of identifying Coulverson and Davis as accomplices. (In the original interview, Clark had referred to them as his companions, but had refused to identify them by name.)

*March 11, 1963:* Officer Fusilier, having returned with Clark to Los Angeles, had a tape-recorded interview with him in the Los Angeles jail, after which Clark was arraigned on the complaint which had been filed against him on December 4, 1962. Preliminary hearing was set for March 18th.

*March 13, 1963:* The district attorney caused the matter to be advanced, and obtained an ex parte dismissal of the complaint against Clark.

*March 20, 1963:* This was the date last set for trial of all defendants under the indictment. Clark requested a continuance, and the prosecution joined in the motion. The other defendants objected, and Davis moved for severance. The motion for severance was denied, and continuance granted to April 1st for Clark's arraignment and plea.

*April 1, 1963:* Clark moved to dismiss the indictment, and the matter was continued to April 5th.

*April 5, 1963:* Clark's motion to dismiss was denied. Clark pleaded not guilty, and the trial was set for April 22d.

*April 15, 1963:* The matter was advanced for Clark's motion to sever. The motion was denied. Over the objection of both Coulverson and Davis (that 60 days from the date of indictment would elapse on April 26th) trial date was continued to May 13th in order to give Clark's attorney time to prepare. Coulverson and Davis gave notice that on May 13th they would move for dismissal on the ground of unconstitutional delay.

*May 13, 1963:* Coulverson's and Davis' motion to dismiss was made and denied, and trial commenced.

*May 24, 1963:* The prosecution rested, after having made its case against Clark by the testimony of witnesses and Clark's extrajudicial statements, but against Coulverson and Davis by the introduction of their respective extrajudicial statements, only. Clark rested without offering any defense. Coulverson and Davis made motions for an advisory verdict under Penal Code section 1118,[6] and for dismissal under Penal Code

---

[6]Penal Code equivalent to the directed verdict in a civil case, except that it does not bind the jury to acquit.

section 1100.[7] Both motions were denied, and the trial continued.

*May 27, 1963:* Davis rested and again moved for advisory verdict under section 1118. The motion was denied.

It should be emphasized that there was no testimony from any prosecution witness linking either Coulverson or Davis with the crimes, other than Officer Fusilier's introduction of the various statements made to him as set forth above. After the prosecution rested, and Davis' and Coulverson's various motions for dismissal and advisory verdicts had been denied, each of the latter took the stand on his own behalf. Clark did not take the stand, except on *voir dire* for the purpose of testifying to the involuntary nature of his statements to Fusilier, and offered no defense during the guilt phase of the trial.

### The Death Penalty:

The Attorney General concedes that two assignments of error, made by defendant Clark in regard to the penalty phase of his trial, are well taken. The first of these stems from jury instructions embracing those matters condemned in *People* v. *Morse,* 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33]; *People* v. *Hines,* 61 Cal.2d 164 [37 Cal.Rptr. 622, 390 P.2d 398]; and *In re Jackson,* 61 Cal.2d 500 [39 Cal.Rptr. 220, 393 P.2d 420]. The second is that the court, over Clark's objections, allowed the jury to hear that portion of the tape recording of his extrajudicial statements which contained admissions of a number of other criminal offenses, the corpus delicti of which had not been proved in any manner. Since the authorities cited hold that the first such admitted error requires reversal per se because the error must be deemed prejudicial, only limited discussion of the penalty trial is required. The judgment imposing the death penalty must be reversed.

### Introduction of the Extrajudicial Statements:

Each of the extrajudicial statements of the three defendants was introduced through Officer Fusilier, of whom the trial judge said at one point in the trial, "It is this witness who, as I say, is either the most stupid man I have ever heard in this department, or at least he can't tell the truth." Although contending that each statement was given without

---

[7]Providing for discharge of one of two or more codefendants as to whom there is insufficient evidence, in order that he may be a witness for the remaining codefendant.

coercion, Fusilier offered no testimony to the effect that he had warned any of the defendants of the right to counsel or the right to remain silent. On the contrary, he admitted that he knew of no reason why such warning should be given. He further admitted that he had elicited the statements from both Davis and Coulverson by showing them pictures of Jordan lying dead in his own blood on the market floor, and telling them that he had witnesses who saw Davis' car at the scene of the crime and who had identified the defendant then being examined as the killer.[8] He admitted that his claim of identification of Davis and Coulverson was untrue, and that he knowingly made the false statements for the sole purpose of getting the suspects to tell the full story. After such an opening, he proceeded in each instance with an interrogation obviously designed to elicit a confession.[9]

From the foregoing it appears that each of the extrajudicial statements which were introduced into evidence (two allegedly made by Davis, one by Coulverson, and two by Clark) were obtained by the police while the interrogated defendant was under arrest.[10] It also appears that each such statement was obtained by a process of interrogation designed to elicit incriminating statements, that the authorities had not effectively informed any defendant as to his right of counsel or his right to remain silent, and that there had been no effective waiver of such rights. In this situation we need give no consideration to the further fact that at least two of the statements were obtained by police trickery. Even in the absence of that element, the introduction of each statement constituted error. (*Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]; *People* v. *Dorado, ante,* p. 338 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Stewart, ante,* p. 571 [43 Cal.Rptr. 201, 400 P.2d 97].)

Respondent contends that if the introduction of the extra-

---

[8]While it was true that witnesses had obtained the license number of Davis' car when Clark fled the scene of the crime, it was untrue that any witness had been able to identify the other occupants. The license number led the police to Davis, and his account of the activities led them to Coulverson.

[9]Such design is most clearly indicated in the interrogation of Coulverson, who was most disinclined to answer questions. He was told that he might as well do so, since Davis had already told the whole story. Further reluctance was overcome, in each instance, by similar tactics designed to obtain a repetition which would not be hearsay as to Coulverson.

[10]Clark was not only under arrest when his statements were obtained, but was also subject to a complaint filed in the magistrate's court and an indictment returned by the grand jury.

judicial statements constituted error, that error was not prejudicial under section 4½ of article VI of the California Constitution. ▮ Insofar as Clark is concerned, his extrajudicial statements were clearly confessions, as that term is used in *Dorado,* and thus their admission into evidence must be deemed to have been prejudicial per se. ▮ However, both Coulverson and Davis took the stand and testified to most of the facts contained in their previously introduced extrajudicial statements.[11] Did this cure the prejudice in erroneously admitting the improperly secured extrajudicial statements? It did not.

It should first be noted that we are not concerned with the question as to whether these extrajudicial statements were confessions or admissions. In either event, when introduced, their prejudicial effect is obvious. In the People's case in chief they constituted the only evidence connecting these defendants with the crimes charged. This prejudice was not cured by both defendants later taking the stand and testifying to the same facts. This is so because here the prosecution rested after having produced no substantial evidence against either Coulverson or Davis, except that contained in the improperly obtained extrajudicial statements. At that moment, when the prejudice was unquestionable, those defendants moved for advisory verdicts in their favor. If the trial judge had been cognizant, as we are now, that the only evidence against the defendants was improperly introduced, he would have been compelled to grant such motions. Being unaware of the law not yet announced, he denied the motions, and defendants were compelled to proceed with a defense under circumstances wherein they would have otherwise rested. It was only after those combined errors that they took the stand and testified to matters which contained both the exculpatory and incriminatory inferences which also appeared in their previously introduced statements. That testimony was obviously the fruit of the errors, and may not be relied upon as curing the very errors which compelled it (*Fahy* v. *Connecticut,* 375 U.S. 85, 91 [84 S.Ct. 229, 11 L.Ed.2d 171]). See also *Henry* v. *Mississippi,* 379 U.S. 443* [85 S.Ct. 564, 13 L.Ed.2d 408], in which the court discussed the possible claim of harmless error in the introduction of illegally ob-

---

[11]As pointed out above, Clark did not testify during the guilt phase of the trial, except on *voir dire* as to the voluntary nature of his extrajudicial statements.

*Filed January 18, 1965.

tained evidence (at fn. 6), and said that "nothing occurring after the judge's refusal to honor petitioner's objection could have this curative effect."

The error inherent in the introduction of each of the extra-judicial statements was clearly prejudicial. For that reason the judgments of conviction must be reversed as to each defendant.

*Right to Speedy Trial:*

There is another issue raised by Coulverson and Davis. They complain of a violation of their constitutional guaranty of speedy trial. The chronological résumé set forth above indicates that, over the continued objection of these defendants, the trial was delayed until five months and ten days after their arrest, five months and one week after the first complaint was filed against them, almost four months after an information was filed in the superior court, two and one half months after an indictment was obtained and the information dismissed, and 63 days after Clark was received in custody in this state.[12] During all that period they remained in jail.

Section 13 of article I of the California Constitution provides that every defendant in a criminal case shall have a speedy trial. ▇ Section 1382 of the Penal Code implements that constitutional provision, and makes dismissal mandatory when the defendant is not brought to trial in a superior court within 60 days after the filing of information or indictment, unless good cause be shown. It has long been held that a trial delayed more than 60 days, without good cause, is not a speedy trial. (*Harris* v. *Municipal Court,* 209 Cal. 55 [285 P. 699].) ▇ When the issue arises before trial, prejudice will be presumed from a violation of defendant's right to speedy trial unless the prosecution successfully meets its burden of showing good cause for delay. (*People* v. *Wilson,* 60 Cal.2d 139, 151 [32 Cal.Rptr. 44, 383 P.2d 452].)

In the instant case the prosecution attempted to meet its burden by the claim that delay was necessary in order to obtain the presence of the defendant Clark, and subsequently in order to allow Clark's attorney necessary time for preparation. Respondent now urges that since the prosecution had

---

[12]We do not imply that, in an ordinary case, the prosecution is not entitled to dismiss an accusatory pleading without losing the right to file another within the statutory period.

an unqualified right to proceed against the three defendants in a joint trial, there was sufficient cause for the delay. Since as to Coulverson and Davis there was a delay beyond the 60-day limit the question is whether, under all of the facts of this case, the prosecution's right to try these defendants jointly with Clark constituted good cause for such delay.

Penal Code section 1098 provides that defendants who are jointly charged with the commission of a crime must be tried jointly unless the trial court, in the exercise of its discretion, orders separate trials. ██ ██ It is also true, as borne out by the authorities cited by respondent, that: (1) the trial court has full discretion in determining a motion for severance; (2) when exercised, that discretion will not ordinarily be disturbed by a reviewing court; and (3) when circumstances require appellate review, an appellate court will look only at the facts existing at the time of the motion and will not consider events that occurred afterwards. (*People* v. *Eudy*, 12 Cal.2d 41 [82 P.2d 359].) ██ However, as stated in *Eudy* (at p. 46), "There can be no clearly defined rule for determining when a defendant is entitled to a separate trial because the exercise of discretion means that the decision must be based upon a just and proper consideration of the particular circumstances which are presented to the court in each case." ██ It follows that there was an abuse of discretion in granting the delays if it can be shown that the insistence on joint trial was not in good faith, or that it was solely for the purpose of obtaining an otherwise illegal delay, to take unfair advantage of the defendants, or was not reasonably predicated upon the purpose and intent of the statute which grants the right to try the defendants jointly.

In order to assess the validity of the several orders of the trial court denying motions for severance and granting continuances, we must bear in mind several facts and propositions of law. ██ Originally Coulverson and Davis were charged in one accusatory pleading, and Clark in another. Under those pleadings the prosecution had no unqualified right to try the three jointly (Pen. Code, § 1098, *supra*). Subsequently the prosecution obtained a joint indictment of the three, and moved to dismiss the original accusatory pleading. That motion was granted over the objection of Coulverson and Davis. Subsequent motions to sever, made on the ground that a joint trial would necessitate unreasonable (and unconstitutional) delay, were denied. At none of these mo-

tions did the prosecution urge any cause other than its asserted right to proceed against all defendants jointly. It offered no factual reason why such a joint trial was either necessary or convenient. ▮▮▮ On the contrary, it had in its possession certain facts which were unknown to both the trial court and the defendants Coulverson and Davis, which facts, if divulged, would have constituted ample ground for severance. We allude here to the fact that Officer Fusilier had prevailed upon Clark (prior to the motions to sever and advance the trial date) to amend his extrajudicial statement given in St. Louis. As pointed out above, the amendments were made for the sole purpose of inserting into that statement the names of Coulverson and Davis. At the time Fusilier obtained such amendment, the statement already constituted a complete confession. Even if that police officer was unaware of the law which prevented the introduction of that statement into evidence as against Coulverson or Davis, the prosecuting attorney must be deemed to have been aware thereof. Since he (and only he) knew of his intention to offer no witnesses who would connect either Coulverson or Davis with the crimes, his motive in first obtaining the amendments to the confession, then dismissing the separate accusatory pleadings, and subsequently insisting on joint trial, must be viewed as having been born of a desire to have the jury which was to try Coulverson and Davis also hear the extrajudicial statement of Clark which named the others as accomplices. The amendments obtained by Fusilier have no other meaning, and no other purpose has been suggested.

In arguing against a severance and for the continuances the prosecution should have divulged these facts to the trial court. Certainly, whether the failure to divulge was intentional or unintentional, our review must be predicated upon any fact presented, or which should have been presented, to the trial court.

In this proceeding the trial judge, without full knowledge of the facts, first granted a motion, over the objection of Coulverson and Davis, to dismiss the original accusatory pleading and allow joint trial under the joint indictment. This order, alone, resulted in delay of trial far beyond the constitutional limitation, and Coulverson and Davis urge that the court was without jurisdiction to proceed when 60 days had elapsed from the filing of the information. But we need not reach such issue. ▮▮▮ The court's subsequent orders denying severance and granting continuances, also made with-

out full knowledge of the facts, constitute sufficient ground for a holding that no good cause was shown for continuance of trial for more than 60 days after the joint indictment was filed.[13] Finally, no good cause was shown why the last continuance was granted to a date 63 days after Clark was returned to California. Ostensibly, that last continuance was for the purpose of allowing Clark's counsel time to pre-

---

[13]Some authorities in this field feel that a denial of a motion to sever amounts to a denial of due process whenever joint trial will require a jury to determine both the voluntary nature and truth of an extra-judicial statement which incriminates both the maker and his codefend-ant. The reasoning is that the jury, even though instructed that an extra-judicial statement is not to be considered against any defendant save he who made it, cannot put out of mind its determination of the truth of that statement in all of its details. Hence, it unconsciously accepts the truth of the hearsay.

In *Jackson* v. *Denno*, 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908], the United States Supreme Court held that a jury is ordinarily incapable of separating the issue of voluntariness of an extrajudicial statement from the issue of its truth, and that due process requires that the trial judge determine the first issue. If defendants are to be tried under cir-cumstances wherein their several extrajudicial statements incriminate the others, even more is required of the jury than under the situation in-volved in *Jackson*. In such case, the jury is expected to forget that it found the statement containing the hearsay incrimination to be true. As said in *People* v. *Chambers*, 231 Cal.App.2d 23, 33 [41 Cal.Rptr. 551] ''Thoughtful judicial opinions have voiced misgivings as to jurors' ability to segregate evidence into separate intellectual boxes, each con-taining a single defendant. (*People* v. *Biehler*, *supra*, 198 Cal.App.2d at p. 298 [17 Cal.Rptr. 862]; see also *United States* v. *Haupt*, 136 F.2d 661, 673-674.) Unconscious motivations . . . slip into the processes of con-scious mentation unseen, unfelt and usually unacknowledged. . . . [J]udicial cliches carving jurors' minds into autonomous segments may waver and fail.''

In *Jackson, supra,* the court quoted with approval from Morgan, Some Problems of Proof under the Anglo-American System of Litigation (1956) pages 104-105, where the author says, referring to the issue of voluntari-ness, '' 'regardless of the pious fictions indulged by the courts, it is useless to contend that a juror who has heard the confession can be uninfluenced by his opinion as to the truth or falsity of it. . . . [T]he rule of exclusion ought not to be emasculated by admitting the evidence and giving to the jury an instruction which, as every judge and lawyer knows, cannot be obeyed.' '' If this be so, how can that juror be uninfluenced by that portion of the confession which incriminates a codefendant? If he finds the confession to be true, does he find it true only in those matters where-in the codefendant plays no part? Can he find that the confession is true insofar as it admits that A committed certain acts in concert with B, and not at the same time believe that B committed those same acts in concert with A? By finding the confession to be true, has he not convicted the codefendant without benefit of other evidence? The incongruity of any rule which assumes that this dilemma may be cured by instructions is discussed in a comment in 78 Harvard Law Review 211, at page 213. It has been argued that a proper rule would either (1) require severance of trials when such extrajudicial statements are to be used, (2) make such statements inadmissible when the prosecution insists on joint trial, or (3) allow joint trial and use of extrajudicial statements only after the trial judge has deleted therefrom all reference to any codefendant.

pare. Even if the refusal to sever Clark's trial from that of his codefendants had been proper, we are unable to understand why his counsel would require more time to prepare than is provided, by statute, for the maximum lapse between indictment and trial. All facts necessary for this last determination were before the court when it granted the unconstitutional continuance. Coulverson and Davis called this to the attention of the court, gave ample notice of motion, and unsuccessfully moved for dismissal when the constitutional period had expired. Their motions should have been granted.

It is true that under the rule adopted by a majority of this court in *People* v. *Wilson, supra,* 60 Cal.2d 139, such error (when reviewed on appeal as distinct from mandamus or prohibition) would not require reversal of the judgment in the absence of a showing of prejudice under article VI, section 4½, of the California Constitution. Since the judgments against Coulverson and Davis must be reversed on other grounds, however, the status of their cases on remand will be the same as though no trial had occurred, and as the *Wilson* case recognized, no showing of prejudice is required to secure a dismissal before trial when a defendant establishes that he has been denied his right to a speedy trial. (*People* v. *Wilson, supra,* 60 Cal.2d at p. 151.) Accordingly, failure to have granted Coulverson's and Davis' motion requires dismissal as to these two defendants, without the necessity of determining the prejudicial nature (if any) of the delay.

*Disposition of Other Issues:*

During the course of this appeal we requested the parties to brief certain issues which came to our attention by reason of the decisions of the United States Supreme Court in *Malloy* v. *Hogan,* 378 U.S. 1 [84 S.Ct. 1489, 12 L.Ed.2d 653] (holding the Fifth Amendment privilege against self-incrimination to be binding upon the several states), and in *Jackson* v. *Denno, supra,* 378 U.S. 368 (relating to the procedure to be followed in determining the voluntary nature of an extrajudicial admission or confession). The first of such issues has now been determined for us by the more recent decision in *Griffin* v. *California,* 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106], wherein the court expressly held that the comment on a defendant's failure to testify (as provided in article I, section 13, of the California Constitution) is violative of the privilege against self-incrimination. Inasmuch as we are dismissing or reversing the judgments on other grounds, we do not reach the question whether article VI, section 4½, of the California

Constitution is applicable to such an error. The second issue may be applicable on a second trial of the defendant Clark; but since he has not taken advantage of our invitation to be heard on that point, it need not be here discussed.

This leaves only the contention of Clark that he was entitled to instructions on second degree murder or manslaughter on the guilt issue, and to instructions during the penalty phase on his contention that the killing was accidental. These two contentions, which will arise on a second trial, should be discussed.

 The first contention is clearly without merit. Even though it be conceded that the evidence produced during the guilt phase of the trial allows an inference that the killing was accidental, it occurred during the perpetration of a robbery. The court instructed the jury, during the guilt phase of the trial, that "Murder which is committed in the perpetration or attempt to perpetrate robbery is murder of the first degree, whether the killing was intentional, unintentional or accidental. . . . [T]he evidence in this case is such that considering each defendant separately, he is not guilty of the charge of murder or he is guilty of murder in the first degree. A robbery is still in commission during the continuous integrated attempt to successfully leave with the loot." As to Clark, this was a proper instruction on the guilt issue. Under the California felony murder rule (Pen. Code, § 189) a killing committed in the perpetration of robbery is murder in the first degree, even when the killing is accidental or unintentional. (*People* v. *Osborn*, 37 Cal.2d 380, 383 [231 P.2d 850], and cases cited.) *People* v. *Jeter*, 60 Cal.2d 671 [36 Cal.Rptr. 323, 388 P.2d 355], on which Clark relies, is not in point since there the question whether defendants had killed during the commission of a felony was in dispute, whereas here there is no such issue.

 Nor is Clark correct in his contention that he was entitled to have the jury specifically instructed on his claim of accident when determining the penalty. Penal Code section 190.1, which provides for the bifurcated trial, also provides that on the penalty trial evidence may be presented "of any facts in aggravation or mitigation of the penalty." This does not mean that the court should emphasize a single piece of evidence, favorable to one side or the other, for the jury's deliberation. It is sufficient that the court clearly advises the jury that they may consider any fact in evidence in determining the penalty. Neither *People* v. *Modesto*, 59 Cal.2d 722 [31

Cal.Rptr. 225, 382 P.2d 33], nor *People* v. *Carmen,* 36 Cal.2d 768 [228 P.2d 281] (which hold that a defendant is entitled to have the jury fully instructed on any theory of his case as to which evidence has been admitted), are in point. They refer to specific issues arising during the guilt phase of the trial. Here the issue is whether, under all of the evidence, the jury will choose one penalty or the other.

All judgments are reversed. Crim. 7610 (Clark) is remanded for a new trial in conformity with the views expressed herein. Crim. 7615 (Coulverson and Davis) and Crim. 7616 (Davis) are remanded with instructions to dismiss the proceedings. Crim. 7617 (Davis' appeal from the order revoking his probation and pronouncing sentence in regard to a prior conviction) is remanded for such further proceedings as may be proper in the light of the dismissal of the subsequent charges.

Traynor, C. J., Tobriner, J., and Peek, J., concurred.

BURKE, J., Concurring and Dissenting.—I concur in the reversal of the judgments of conviction of defendants Coulverson and Davis based upon the application of section 4½, article VI, of the California Constitution. (See concurring opinion in *People* v. *Stewart, ante,* pp. 571, 582 [43 Cal.Rptr. 201, 400 P.2d 97].)

I dissent from the instructions to dismiss the proceedings (Crim. 7615, Coulverson; and Crim. 7616, Davis), as I believe the granting of the continuances complained of to have been within the sound discretion of the trial judge.

I dissent from the reversal of the judgment of conviction of defendant Clark because under the application of section 4½, article VI, of the California Constitution after examination of the entire cause, including the evidence, in my opinion it is not reasonably probable that a result more favorable to defendant Clark would have been reached in the absence of the errors of which defendant complains. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) Here, there were eyewitnesses to the armed robbery and to the cold-blooded killing of one of the victims, who had done absolutely nothing to cause defendant Clark to shoot him. The gun had a hair trigger which could be fired only by cocking the hammer and pulling the trigger. Witnesses testified to hearing the gun being cocked during the holdup and shortly before the firing.

The judgment as to defendant Clark should be affirmed in its entirety.

McComb, J., and Schauer, J.,* concurred.

Respondent's petition for a rehearing was denied July 14, 1965, and the judgment was modified to read as printed above. Mosk, J., did not participate therein. McComb, J., and Bray, J.,† were of the opinion that the petition should be granted.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judical Council.